```
 1                 IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                    CASE NO. 1:20-cv-24374-BB
 3

 4     MARGLLI GALLEGO,

 5            Plaintiff,                    March 11, 2021
                                           10:01 a.m.
 6            vs.

 7     IVETTE PEREZ, et al.,

 8            Defendants.                   Pages 1 THROUGH 30

 9     _____

10
                     TRANSCRIPT OF MOTION HEARING
11                      VIA THE ZOOM PLATFORM
                  BEFORE THE HONORABLE BETH BLOOM
12                   UNITED STATES DISTRICT JUDGE

13
       Appearances:
14
       FOR THE PLAINTIFF:  RASCO KLOCK PEREZ NIETO, PL
15                         HILTON NAPOLEON, II, ESQ.
                           2555 Ponce De Leon Boulevard, Suite 600
16                         Coral Gables, Florida 33134

17
       FOR THE DEFENDANT:  MIAMI-DADE COUNTY ATTORNEY'S OFFICE
18                         EZRA SAUL GREENBERG, ESQ.
                           111 Northwest 1st Street, Suite 2810
19                         Miami, Florida 33128

20
       COURT REPORTER:     Yvette Hernandez
21                         U.S. District Court
                           400 North Miami Avenue, Room 10-2
22                         Miami, Florida 33128
                           yvette_hernandez@flsd.uscourts.gov
23

24

25
```

1          (Call to order of the Court, 10:01 a.m.)

2               THE COURT:  All right.  Good morning to everyone.

3               MR. GREENBERG:  Good morning, Your Honor.

4               THE COURT:  All right.  Let's go ahead and call the

5     case, so we can get started.

6               COURTROOM DEPUTY:  Calling Civil Case Number 20-24374,

7     Marglli Gallego v. Ivette Perez, et al.

8               Counsel, please state your appearances for the record,

9     starting with Plaintiff's counsel.

10              THE COURT:  Mr. Napoleon, you're muted, sir.

11              MR. NAPOLEON:  I'm sorry, Your Honor.  I was following

12    the best practices, so I apologize about that.  Always a

13    pleasure to see you.

14              Hilton Napoleon on behalf of the Plaintiff, Marglli

15    Gallego.

16              THE COURT:  Good to see you, sir.

17              MR. GREENBERG:  Good morning, Your Honor.  Assistant

18    County Attorney Ezra Greenberg on behalf of the Defendants.

19              THE COURT:  Good to see you as well.

20              And is Ms. Gallego also present?

21              MR. NAPOLEON:  Yes, Your Honor.  Yes, Your Honor,

22    Ms. Gallego is present in white, with her hand up, and there

23    are also several members of the Hammocks Community Association

24    present.

25              THE COURT:  All right.  And I'm not certain if there

```
1    are other attorneys or parties that wish to make their

2    appearances.  Are there any others?

3              MR. JAUREGUI:  Good morning, Your Honor.  Sabino

4    Jauregui.  I just wanted to say hi.  Long time seeing you and

5    Elizabeth.  I just wanted to say hi, Judge.

6              THE COURT:  It is good to see you as well.  I hope you

7    and your family are doing well.

8              MR. PASTOR:  And good morning, Your Honor.  Bernie

9    Pastor.  I'm not appearing.  I'm here just supporting

10   Mr. Greenberg.  And I'd also like to introduce Fabiana Cohen,

11   who is one of the newest members of our office and one -- and a

12   member of our section.  She clerked for Judge Lewis.  And most

13   recently she's one of the first clerks for Judge Ruiz.  So you

14   may be seeing her a little bit more often.  She's here to

15   observe as well.

16             Nice seeing you, Judge.

17             THE COURT:  You made a great selection, Mr. Pastor,

18   because I have had an opportunity to work with Ms. Cohen, and

19   she is just exceptional.  She is bright and thoughtful, and I

20   have no doubt that she will do well and you are better off

21   because of that relationship that you now have.

22             MR. PASTOR:  We are.  She will be in our section, so

23   you'll be seeing a lot more of her probably.

24             THE COURT:  All right.  Well, let us get to work.

25             We are here for a hearing based on a motion to
```

1  dismiss, Docket Entry 22, that was filed by Defendants Ivette

2  Perez and Carlos Luffi.  The two other officers, Officers

3  Garcia and Escobar, have answered the complaint.  But what is

4  before the Court is the motion to dismiss with regard to these

5  two officers.

6       And before we proceed, I did note from the briefing,

7  Mr. Napoleon, there is a state court defamation lawsuit that is

8  pending against these two officers?

9       MR. NAPOLEON:  Yes, Your Honor.  That's correct.

10       THE COURT:  All right.  While certainly the Defendants

11  bear the burden, I bring this up, Mr. Napoleon, because you

12  actually had made comment, on Page 2, Footnote 3, that you ask

13  for an opportunity to amend the complaint.  So let me ask

14  before we get started:  Are all of the facts with regard to

15  Officers Perez and Luffi and their involvement and

16  participation -- are they all sufficiently pled in the

17  complaint?

18       MR. NAPOLEON:  The majority of them are, Your Honor.

19  I don't -- I didn't foresee what the Defense was going to raise

20  regarding qualified immunity.  I didn't know what that was

21  going to be.  There are some facts that are not in there that

22  are very important.  For example, Carlos Luffi is a sergeant

23  with the Miami-Dade Police Department and he does have some

24  form of supervisory role over the other officers.  That is not

25  actually in the complaint, but I do think that that is a fact

1    that is relevant.

2         There are other issues that deal with defamation, or

3    more specific facts, that I listed in the defamation complaint

4    that are not in this particular complaint.  I believe that

5    those are relevant in the sense that we're talking about a

6    history and how Ms. Gallego felt or whether or not she felt she

7    was free to leave and whether or not these officers' actions

8    contributed to her belief as to whether or not she believed

9    that she was free to go.

10        THE COURT:  So before we proceed with the argument,

11   Mr. Napoleon, are there additional facts that you believe

12   should be pled in your complaint?

13        MR. NAPOLEON:  In an abundance of caution, Your Honor,

14   I would like to -- I believe that the facts pled are

15   sufficient.  If Your Honor doesn't believe so, and if Your

16   Honor is going to grant their motion, then I would like an

17   opportunity to amend the complaint.

18        So I believe that the complaint is sufficient, but I

19   do believe that there are additional factors in there that

20   would contribute to denying their motion for qualified

21   immunity.

22        THE COURT:  Well, let me state, while I asked the

23   question certainly because you requested it in Footnote 3 of

24   your response, the Court also notes that in your response

25   you've referenced facts that appear to be either missing or

1    different than what's contained in the complaint.

2              And I'll be very specific.  For example, in Paragraph

3    41, you've referenced the statement by Officer Perez

4    continuously repeated:  "I'm going to be able to sit across

5    from you and ask questions"; however, in your response on Page

6    23, it appears to be different -- or excuse me -- Page 12.  If

7    I look at Page 12, you've stated a different statement.  You

8    said:  "When Ms. Gallego said or did something contrary to

9    their liking, physical force was used against her."  And it's

10   unclear -- seems as if you've lumped the Defendants.

11             And then you've stated on Page 13:  "Perez and Luffi

12   continue to mock Ms. Gallego publicly by flashing handcuffs

13   toward her and stating:  'I can't wait to sit in front of you

14   and ask questions,'" which is a statement that is different

15   than what is alleged in the complaint.

16             MR. NAPOLEON:  Your Honor, if I can -- for some

17   reason, I'm looking at Page 12 and 13, and maybe my numbers are

18   off -- oh, I'm sorry.  When my --

19             THE COURT:  Pages 12 and 13 of the Plaintiff's

20   response, Docket Entry 29.

21             MR. NAPOLEON:  Right.  I found it.  I'm sorry, Your

22   Honor.  It says:  "When Ms. Gallego said or did something

23   contrary to their liking, physical force was used against her

24   to temporarily detain her."  What I was referring to in that

25   particular statement, Your Honor, I was referring to when

```
 1   Ms. Gallego asked the officers whether or not they were related

 2   to somebody in the association because of the strange conduct

 3   that they have been exhibiting over the years.

 4            So in reference to -- when I stated that:  "When

 5   Ms. Gallego said or did something contrary to their liking,

 6   physical force was used to temporarily detain her," and what I

 7   was referring to -- the only physical force that was used --

 8   and I want to be clear, and I apologize if that was not

 9   clear -- the only physical force that was used was against --

10   was -- I'm sorry -- was by Garcia and Escobar.  There was no

11   physical force used by Perez or Luffi.

12            THE COURT:  All right.  And are there any additional

13   actions on behalf of Officer Luffi or Officer Perez where they

14   restrained Ms. Gallego's freedom of movement?

15            MR. NAPOLEON:  Were there any physical actions or

16   additional statements that were made?

17            THE COURT:  Actions.  I think if we look at the West

18   case, it speaks of action, which would be the participation.

19   So are there any actions in which Officer Luffi or Officer

20   Perez restrained Plaintiff's freedom of movement that are not

21   set forth in the complaint?

22            MR. NAPOLEON:  There are not any physical actions;

23   however, there were statements that were made.  Luffi and Perez

24   spoke to Garcia and Escobar before this event actually

25   happened.  So that's one of the things that I would like to add
```

```
 1    in the amended complaint, because this wasn't a situation where

 2    Perez and Luffi made comments towards Ms. Gallego and all of a

 3    sudden, out of the blue, they did grab her.  When I say:

 4    "They," I'm talking about Garcia and Escobar, but Garcia and

 5    Escobar also had spoken to Perez and Luffi before the physical

 6    event happened.

 7          So my point is that although we do not know exactly

 8    what was said, or at least it's not detailed in the complaint

 9    exactly what was said, we do have reason to believe -- because

10    Ms. Gallego actually ran into one of the officers afterwards

11    and they told her that they believed that she was going to be

12    arrested.  And I'm basing -- I believe that they said that

13    based on their conversations with Detectives -- or Sergeant

14    Luffi and Detective Perez.

15          THE COURT:  All right.  Thank you, Mr. Napoleon.

16          It certainly does appear that there are some

17    additional facts that are not contained within the complaint.

18    So --

19          MR. NAPOLEON:  Right.

20          THE COURT:  So let us address -- since it is the

21    Defendant's burden, let's address some of the points that were

22    raised.  And Mr. Greenberg, will you be making the argument?

23          MR. GREENBERG:  Yes, Your Honor, I will.

24          THE COURT:  All right.  And I want to thank the

25    parties for the briefing.  Certainly there are several Eleventh
```

1   Circuit cases with regard to officers' actions and their

2   participation.  And let me just ask you, Mr. Greenberg,

3   Officers Luffi and Perez certainly maintain that they have made

4   no physical contact with the Plaintiff and took no steps to

5   restrain her liberty.  Mr. Napoleon has pretty much confirmed

6   that.  But isn't it true that an officer may seize an

7   individual by a show of authority?

8           MR. GREENBERG:  Hypothetically, that's true.  But

9   there's certainly not sufficient allegations in this case that

10  either Perez or Luffi engaged in a sufficient show of authority

11  to seize the Plaintiff.  And I think the West v. Davis case,

12  which Your Honor alluded to, would entitle them to qualified

13  immunity on that basis.  Because when the Court examines the

14  facts in West, all the conduct that Mr. Napoleon cites to, the

15  statements that she was going to be arrested, the flashing of

16  the handcuffs, the Eleventh Circuit specifically found those

17  actions did not amount to the Terry stop.  In West, they state

18  only when the plaintiff was grabbed, that's when the Terry stop

19  occurred.  And here, neither Luffi nor Perez are alleged to

20  have grabbed the Plaintiff.

21          So if you go to West, West supports an argument on

22  behalf of Perez and Luffi that neither of them engaged in

23  sufficient conduct to constitute a Terry stop, and that's

24  enough to establish qualified immunity.  Because remember, the

25  law has to be clearly established against them.  If there's

1    multiple reasonable readings of the law, and certainly if

2    there's a reading of the law that would support the officers,

3    they get qualified immunity.

4         I think the issue in this case is what level of

5    participation does an officer who is not the one restraining

6    the Plaintiff have to engage in in order for them also to be

7    liable.  And the fact is there's no case that the Plaintiff has

8    cited, and I'm not aware of any Eleventh Circuit authority that

9    has actually gone into detail on that question.  There are some

10   cases from the false arrest context.  But as the Eleventh

11   Circuit made clear in McClish and McCormick, you can't just

12   analogize false arrest to a Terry stop when it comes to

13   qualified immunity.

14        THE COURT:  But the Eleventh Circuit has provided

15   guidance.  In Jones v. Cannon, the Eleventh Circuit made clear

16   in that opinion that a non-arresting officer who sufficiently

17   participates in an arrest may be liable if he or she knew the

18   arrest lacked any constitutional basis.  Isn't that what

19   precisely occurred here?  If we can accept the facts as true,

20   that Ms. Gallego was restrained, and that was an unlawful and

21   warrantless detention, then wouldn't Jones v. Cannon support

22   that Officers Luffi and Perez sufficiently participated in the

23   arrest?

24        MR. GREENBERG:  No.  And for two reasons.  First of

25   all, the officer in Jones, who was the -- I guess what you call

1    the secondary officer, transported the plaintiff to the police

2    station and sat during a custodial interrogation that took

3    place at the police station.  Okay?  So a reasonable officer

4    could reasonably distinguish Jones v. Cannon on that basis.

5         But the second point -- I guess I didn't make it clear

6    earlier -- is in Moore against Pederson -- and I allude to this

7    on Page 8 of the reply -- the Eleventh Circuit had found in

8    2007 that an entry into the home to make an arrest without a

9    warrant was a constitutional violation.  They faced the same

10   issue eight years later, in Moore against Pederson, in the

11   context of a Terry stop.  And what the Court said is:  "Even

12   though we held that that was true in the context of an arrest,

13   the law was not clearly established in the case of a Terry

14   stop.  So we're finding it is a constitutional violation, but

15   we're granting qualified immunity," because you can't just

16   always say what's true for an arrest is true for a Terry stop.

17        So I don't think someone could read Jones -- a

18   reasonable officer would have to read Jones v. Cannon to apply

19   to the context of this case, where all that's alleged is the

20   Plaintiff is briefly detained.  She's never handcuffed.  She's

21   never put in a police vehicle.  And the level of participation

22   is nothing approaching what was in Jones against Cannon.

23        THE COURT:  All right.  Well, why don't we start where

24   we should, and that is in terms of the burdens.  And I want to

25   make sure, Mr. Napoleon, that it does appear from your response

1    that you are agreeing that Officers Luffi and Perez were acting

2    within the scope of their discretionary authority; is that

3    correct?

4         MR. NAPOLEON:  Begrudgingly, yes, Your Honor.

5         THE COURT:  All right.  So with that understanding,

6    obviously the Eleventh Circuit tells us that the burden then

7    shifts to the Plaintiff to demonstrate two prongs, that

8    qualified immunity is appropriate because certainly the

9    officers' conduct violated a constitutionally protected right,

10   and that right was clearly established at the time of the

11   misconduct.

12        I don't want to jump ahead, but I do want to ensure

13   that you understand that for purposes of the qualified immunity

14   claim that it would be a burden that rests on the Plaintiff at

15   this point.

16        Mr. Greenberg, did you wish to make any other argument

17   before I turn the questioning over to the Plaintiff?  And by

18   "questioning," I mean I'm going to be certainly asking some

19   questions.  But I don't want to foreclose or preclude either

20   attorney from making additional argument.

21        MR. GREENBERG:  No.  I'll reserve for the reply.

22        THE COURT:  All right.  Well, let me start --

23   Mr. Napoleon, there's a whole section within the complaint that

24   refers to the history of animus between the officers and

25   Ms. Gallego.  So how is that alleged history of these malicious

1   acts of Officers Luffi and Perez relevant to whether

2   Ms. Gallego was seized?

3         MR. NAPOLEON:  Your Honor, the way that it's relevant

4   is because a seizure, as Your Honor alluded to before, is not

5   necessarily just a physical act.  It's whether a reasonable

6   person in the same situation would have believed that they were

7   free to leave.  So the reason why their history is important is

8   because these officers, for three years at this particular

9   point in time, have been going around the community telling

10  people that they were going to arrest Ms. Gallego.

11        One of the officers -- and I'll be more specific --

12  Sergeant Luffi even confronted an individual in court, who was

13  represented by an attorney, in an attempt to get him to say

14  something against Ms. Gallego.  Of course, that came back to

15  Ms. Gallego.  So when we're talking about her belief that she

16  was not free to leave, what happened beforehand is obviously

17  relevant.

18        One thing, too, that I want to emphasize, Your Honor.

19  You have to remember, this was a closed election in that very

20  same room that these people are sitting here now.  They're

21  homeowners and they were having a private election.  These

22  officers, without probable cause, without a warrant, without

23  any reasonable belief that a crime occurred at that particular

24  point in time, walked into that election and they were told to

25  leave.  They even had a Corrections officer tell the officers

1     that they had to leave, this is a closed election.

2          The officers refused to do so.  And when they refused

3     to do so, there was a conversation obviously where Ms. Gallego

4     asked them, you know:  "Are you related to somebody?"  And then

5     that's when the confrontation escalated, so to speak, where

6     Officer Perez said that:  "I can't wait to put you in a chair."

7     And then Ms. Gallego said that she was represented by an

8     attorney.  Officer Perez said:  "So what?"

9          Why is that important?  Because you have an individual

10    telling an officer that they're represented by an attorney, and

11    that officer simply does not care.  That officer doesn't care

12    if they're even supposed to be here.  The reason why this is

13    important is because that's clearly illegal conduct.  The

14    officers don't have a right to just barge into somewhere.  And

15    then when Officer Luffi dangled his handcuffs, that also

16    contributed to the fact that Ms. Gallego did not believe that

17    she was free to leave.

18         So just because there was no physical contact, with

19    these particular officers, obviously, there was a causal

20    connection, which Your Honor alluded to in Jones.  And in that

21    particular case, the causal connection was that the officer

22    was -- I should say the secondary officer -- even though he was

23    not involved in a lot of things, he was there, and he was

24    involved in the transportation.

25         And what the Eleventh Circuit said in those particular

1   circumstances -- and I'm quoting from Jones v. Cannon, 174 F.3d

2   1271, and this is at 1283 through 84 -- it says that it's a

3   jury question.  And this is a quote:  "We pause to observe that

4   the record presents an issue of fact regarding whether Bishop

5   was sufficiently involved in this warrantless arrest to be

6   liable for false arrest."  And they go on to explain the

7   different things that Bishop did, even though he wasn't the

8   arresting officer and even though he did not author the arrest

9   affidavit.

10          So I cited a long line of cases, as Your Honor alluded

11  to, that there is a causal connection.  And I believe that

12  there is a sufficient jury question.  Viewed in the light most

13  favorable to Ms. Gallego, there is a factual issue whether

14  Perez and Luffi gave commands and also instructed these

15  officers.  Perez said:  "I can't wait to put you in a chair."

16  Right after Perez said that, Garcia and Escobar placed

17  Ms. Gallego in the chair.  Now, that's a clear connection.

18  It's not like Garcia or Escobar Tasered her or slammed her to

19  the ground.  The statement by Perez was causally connected by

20  Garcia's and Escobar's action.  And if you view --

21          THE COURT:  I just want to take issue with the

22  argument, Mr. Napoleon, because it appears to be inconsistent

23  with the allegations.

24          MR. NAPOLEON:  I'm sorry?

25          THE COURT:  And that is, in looking at -- I'm

1    following your argument with the allegations contained within

2    the complaint, and Paragraph 33 states:  "I can't wait to put

3    you in a chair and ask you questions."  Then Ms. Gallego

4    responds:  "I'm represented by a lawyer.  You can't do that."

5    And then it was Officer Garcia who pushes Ms. Gallego away and

6    tells her to sit down in the chair, and she sat down in the

7    chair.

8         The fact that they were present, it would appear to

9    the Court that if the allegation -- if the constitutional

10   violation is that Ms. Gallego was unlawfully restricted, that

11   is, her freedom of movement was restricted for an extended

12   period of time, which is the claim that you're making, I'm

13   failing to see how Officer Perez, in making that statement, and

14   Officer Luffi, in following the unlawful detention, picks up

15   his shirt and shows the handcuffs -- how that is consistent

16   with Jones v. Cannon, where the Court noted -- and again, that

17   was on summary judgment -- but the Court -- in making a

18   determination that there was sufficient evidence to create a

19   jury question with regard to Bishop, the non-arresting officer,

20   the Court noted that Bishop took notes while the other officer

21   prepared the police report.  He transported the individual to

22   jail.  So there was direct participation.

23        I'm just questioning, based on what's alleged, where

24   is the direct participation?  There's a statement made by

25   Officer Perez.  And then it's Officers Garcia and Escobar

1   that -- or at least as alleged it's Officer Garcia who pushes

2   Ms. Gallego and tells her to sit down.  So can you just -- if

3   we look at the allegations, where would the Court find that

4   participation?  And again, I've -- I want to thank each of you

5   for taking time to educate the Court.  But I've reviewed each

6   of these cases, and I'm trying to see where that participation

7   rises to that level.

8          And I say that, Mr. Napoleon, because in the Eleventh

9   Circuit case, the US v. Baker, the Court says that:  "The

10  crucial test is whether, taking into account all the

11  circumstances surrounding the actual encounter" -- not the

12  animus beforehand, but the actual encounter -- "whether the

13  police conduct would have communicated to a reasonable person

14  that she was not at liberty to ignore the presence and go about

15  her business involvement."

16         So if we focus just on the encounter -- because then

17  there's another Eleventh Circuit case that tells the Court that

18  the subjective intent of the officer, that he wanted to arrest

19  the Plaintiff, is irrelevant to a qualified immunity analysis.

20  We have to look precisely at the actions of the officer or the

21  inactions.

22         MR. NAPOLEON:  Right.  So I want to be very succinct.

23  I don't believe that there is -- I think they're inextricably

24  intertwined.  There is no physical -- and I can see that

25  there's no physical actions by Perez or Luffi.  But I'll give

1    you an example, Your Honor.  If two police officers approach

2    me, and one says:  "Cuff him," and then the other one cuffs me,

3    I think that there's a sufficient factual issue as to whether

4    or not that action of making a statement gives rise to a casual

5    [sic] connection.

6          So my point is not that they actually physically did

7    anything.  My point is that at that particular point in time,

8    when Perez said:  "I can't wait to put you in a chair," and

9    then Garcia puts her in a chair, that is the casual -- or the

10   causal -- I'm sorry -- connection that I'm saying that Perez

11   was involved in.

12         If she never had made that statement, I would agree

13   with Your Honor.  But it's so close together:  "I am going to

14   put you in a chair," and she gets placed in a chair.  If they

15   would have slammed her to the ground or if they would have

16   Tasered her at that particular point in time, I would agree

17   that the statement and the actions are not reasonably related.

18   But if you view it in the light most favorable to Ms. Gallego,

19   which you have to do at this particular point in time, that is

20   a sufficient causal connection between her statement and the

21   officers -- sorry -- be more specific -- Garcia's action.

22         The same thing with Luffi.  Okay?  At the particular

23   point in time when Ms. Gallego was already sitting down in a

24   chair, Luffi flashed his handcuffs.  That particular act is

25   sufficiently -- has a sufficient causal connection to the --

```
 1    Garcia's and Escobar's prolonged detention.  And what do I mean

 2    by that?  Garcia and Escobar continued to sandwich Ms. Gallego,

 3    for lack of a better term.  When Luffi flashed his handcuffs, a

 4    reasonable juror could find that the act of flashing his

 5    handcuffs signaled to Garcia and Escobar to keep Ms. Gallego

 6    detained.

 7          Now, it may not be the greatest connection, but I

 8    think that there is a causal connection for a jury to have to

 9    determine or for a jury to have to decide.  The same way when

10    Garcia -- I'm sorry -- when Escobar flashed his handcuffs.

11    It's not as if Garcia -- I'm sorry.  Let me step back because I

12    used the wrong names, because there's so many different

13    officers.  I apologize.  When Luffi flashed his handcuffs, it's

14    not as if Garcia or Escobar Tasered Ms. Gallego or they slammed

15    Ms. Gallego.  The flashing of the handcuffs is reasonably

16    related to the prolonged detention, i.e., giving Garcia and

17    Escobar an indication that they are going to arrest

18    Ms. Gallego.

19          And now, just because it didn't actually happen does

20    not mean that that act of flashing the handcuffs is not

21    connected to the seizure.  And that's --

22          THE COURT:  And let me state in fairness, while I

23    appreciate the argument, that that is -- that Officer Perez's

24    statement:  "I can't wait to put you in a chair and ask you

25    questions," that, as your argument goes -- that that's akin to
```

1   "Cuff him," it's not pled in that light.  I think it's hard to

2   draw that conclusion, that she makes that statement and that's

3   a direction to Officers Garcia and Escobar to then place her in

4   a chair.

5           Similar, the handcuffs by Officer Luffi.  It's

6   unclear, based on the allegations, that those handcuffs were a

7   signal to Officers Garcia and Escobar to prolong the detention

8   that occurred in this case.  I mean, there's no mention that

9   she was actually taken from the homeowners association meeting

10  and arrested.  It's the length of the detention.

11          MR. NAPOLEON:  Right.

12          THE COURT:  So I appreciate the argument.  It's just

13  that those allegations appear to be absent from the complaint.

14  There's a lack of a connection between her statement and

15  Officer Garcia and Escobar's actions.

16          MR. NAPOLEON:  Well, I just want to make sure I

17  understand what Your Honor is saying.  You're saying that the

18  statements are there, that I just haven't explained in the

19  complaint that that is the causal connection?

20          THE COURT:  Well, Officer Perez says:  "I can't wait

21  to put you in a chair."  Ms. Gallego responds:  "I'm

22  represented by a lawyer.  You can't do that."  And then it's

23  Officer Garcia that pushes Ms. Gallego away and tells her to:

24  "Sit down in this chair right now and don't move."  And you're

25  making the argument that that's akin to Officer Perez saying to

1    Officer Garcia to cuff her; in other words, it's a direction --

2         MR. NAPOLEON:  Right.

3         THE COURT:  -- and there's a direction participation.

4    And that's -- I appreciate the argument.  I just don't find

5    that it's -- and I guess you can draw that inference, but it

6    seems to be somewhat of a large inference to be drawn based on

7    the way the complaint is styled --

8         MR. NAPOLEON:  Well, if that's what Your Honor --

9         THE COURT:  -- similar to the cuffs.

10        MR. NAPOLEON:  I can easily -- if Your Honor would

11   allow me to, to make the complaint more -- to draw that

12   inference in the complaint.  If that's missing, then I would

13   like that opportunity.

14        THE COURT:  Well, the reason I share my concern is the

15   Eleventh Circuit has made clear -- and again, there's a

16   plethora of Eleventh Circuit cases and they all stand on their

17   unique facts, but there are lessons and guidance to be drawn.

18   In the case of Alcocer v. Mills, it's very clear that Judge

19   Rosenbaum states that:  "Each defendant is entitled to an

20   independent qualified immunity analysis as it relates to his or

21   her actions and omissions."

22        So with that understanding, this is not a circumstance

23   where the officers are acting in concert with regard to each of

24   the actions taking place.  The Court has an obligation to look

25   specifically and independently at the actions or omissions, in

1    this case, of Officers Perez and Luffi.

2            MR. NAPOLEON:  Your Honor, if I can briefly respond.

3    And I understand what Your Honor is saying one hundred percent.

4    And I know that obviously it is not necessarily binding upon

5    this Court, but I do believe that Judge Moreno encountered a

6    very similar incident in McDonough v. Mata.  The Case number --

7    or I'll just cite -- the Westlaw citation is 2020 Westlaw

8    7350267.

9            In that particular case, a plaintiff gave a police

10   officer the bird.  And one officer, Officer Wright, instructed

11   the Plaintiff to stop, turn around, and place his hands behind

12   his back.  When the plaintiff asked what he was being arrested

13   for, another officer said:  "Disorderly conduct."  And a third

14   officer is the one who ultimately placed the handcuffs on the

15   plaintiff.  The third officer then advised the plaintiff that

16   he was under arrest.  And the third officer authored the arrest

17   affidavit.  Officer Wright, the one who only made a statement,

18   argued that because he was not the arresting officer, and

19   didn't participate in the arrest, the plaintiff failed to state

20   a claim against him for false arrest under the Fourth

21   Amendment.  And Judge Moreno reviewed the very same cases,

22   Jones, Jordan, and Wilkerson, and found those allegations were

23   sufficient to establish a jury question as to whether or not

24   Officer Wright instigated or participated in the plaintiff's

25   arrest, even without any type of, I guess, physical

1    intervention.

2          And while there won't be any -- I think one of the --

3    not to get off on a tangent, but one of the interesting things

4    about civil rights cases is that qualified immunity was a

5    judicially created doctrine that has taken its own -- it has

6    created its own animal.  So we're trying to craft this as

7    the -- at the same time that -- we're trying to craft the law

8    at the same time that these facts are happening.  And I think

9    that, you know, based on the Eleventh Circuit case law, as long

10   as there's some type of causal connection, that's sufficient to

11   go to the jury.

12         THE COURT:  And I agree with regard to the causal

13   connection.  And in looking at Judge Moreno's opinion in the

14   McDonough case, it related to Officer Wright, who argued that

15   he was not the arresting officer, and that, as a result, there

16   was arguable probable cause for the arrest and he had qualified

17   immunity.

18         But getting to the first point, I see the distinction

19   between Officer Wright and here Officer Perez and Luffi as

20   pled.  Because the Court noted that Officer Wright -- and the

21   plaintiff actually alleged that Officer Wright instigated the

22   arrest by ordering him to stop, and that Wright and the other

23   officer told plaintiff he was under arrest.  So the Court goes

24   on:  "The allegations also established that Officer Wright was

25   present during the entire incident, observed what transpired.

 1   The Court finds the allegations sufficiently state that Officer

 2   Wright instigated in and participated in the arrest.  The Court

 3   will review his level of participation on a motion for summary

 4   judgment."

 5         And so I agree with you that, while it's closer, I

 6   think the facts there is he ordered him to stop.  He was the

 7   one involved in the arrest.  The fact that Officers Luffi and

 8   Perez were present during the entire incident obviously weighs

 9   toward the finding by the Court in McDonough.  I just believe

10   that there are additional facts that, while you've argued

11   them -- you have argued them in the response -- I don't see

12   them in the complaint.

13         So with regard to that causal connection, that finding

14   that Officers Luffi and Perez participated, I think that that

15   needs to be stronger.  And that's -- in reviewing all of the

16   case law, I believe that those facts, as pled, appear to the

17   Court to be insufficient.  And we can go through the Eleventh

18   Circuit cases, but I think each of you have done an outstanding

19   job of educating the Court and reviewing each of the cases.  I

20   think that's where the Court is duty bound to find that the

21   complaint is insufficient as pled.

22         I do believe that there can be a causal connection,

23   but I think there are some facts that you have drawn out in

24   your response, but are missing from the complaint.

25         MR. NAPOLEON:  No.  I understand, Your Honor.  And

1    that's why I asked for an opportunity -- just because, you

2    know, when you file a complaint, you don't know exactly what

3    every defense they're going to try to put up, which obviously

4    that's the reason the courts allow a complaint to be amended.

5           So number one, Your Honor, I do want to say this:

6    Regardless of what Your Honor's ruling is, I appreciate the

7    opportunity.  Because whether I win or lose motions to dismiss,

8    this is the first time in 15 years of practicing law that I've

9    actually had a judge set a hearing on this motion.  And -- so

10   that you could articulate what your concerns are.  And as an

11   attorney who spends hours and hours crafting these documents,

12   filing these responses, or response in opposition to motions to

13   dismiss, I just appreciate the opportunity to be before Your

14   Honor and to hear what Your Honor's concerns are before a

15   ruling is just entered.

16          So I just wanted to let Your Honor know that because

17   it's important to litigants, to participants, to plaintiffs and

18   defendants.

19          THE COURT:  Thank you, Mr. Napoleon.  I appreciate

20   that.

21          And Mr. Greenberg, I think you can see by my

22   statements where the Court is leaning toward.  In looking at

23   the Defendants' actions, those of Luffi and Perez, it is

24   unclear to the Court the complete actions that show that they

25   caused, instigated, or participated in the detention.

1        So I've already advised Mr. Napoleon that the

2   allegations need to be altered to come in line with some of

3   these Eleventh Circuit cases.  So I guess my question to you,

4   Mr. Greenberg, is:  At this early stage, is there prejudice to

5   the Defendant and is there even an argument that can be made

6   with regard to futility?

7        MR. GREENBERG:  I think there's an argument that could

8   be made.  I'm doubtful that it would be persuasive on the

9   Court, so I'm not inclined to make it.  I think that we should

10  allow Mr. Napoleon to amend it and that will be his final try.

11  And obviously the qualified immunity stay, we would request

12  that that would remain in effect until the Court finds that the

13  second -- or the amended complaint can overcome qualified

14  immunity.  At this point, the Court has not found that.

15       THE COURT:  And with regard to futility, I don't

16  believe that it's futile.  I think that the Plaintiff should be

17  given an opportunity to amend with regard to Officers Luffi and

18  Perez.  Obviously, the two other officers have already

19  answered.  So this is with regard to Counts 1 and 2.

20       So Mr. Napoleon, how much time do you need to file an

21  amended complaint?

22       MR. NAPOLEON:  Your Honor, I don't need much time, but

23  I do want to address one particular issue as far as the stay is

24  concerned.

25       If part of what Your Honor's concern is, is the level

1   of participation between Luffi, Perez, Garcia, and Escobar, I

2   think that it is extremely relevant as to what their

3   conversation was before the actual physical detention occurred.

4   Perez and Luffi had a detailed conversation with Garcia and

5   Escobar before the physical encounter.  I think that their

6   conversation would be very telling.  And here's why:  You have

7   to remember, Garcia and Escobar were employees of Hammocks.  So

8   it must take a lot for an employee to arrest their employer.

9   There had to be a conversation that occurred between Escobar

10  and Garcia and Luffi and Perez.  I guarantee you that that

11  conversation is relevant.

12       Here's why:  Like I said before, Ms. Gallego ran into

13  Officer Garcia at Publix after the fact, and Officer Garcia

14  told Ms. Gallego:  "Oh, I thought you were going to get

15  arrested."  Where would he get that from?  He only could have

16  got that from Perez and Luffi.  So while I understand

17  Mr. Greenberg's concern, I think that it's going to be

18  extremely telling about the conversation between Perez, Luffi,

19  Garcia, and Escobar.

20       THE COURT:  And that certainly may be the subject of

21  discovery.  But specifically with regard to Counts 1 and 2,

22  with Perez and Luffi, I think that I've shared the concerns

23  that I have based on the Eleventh Circuit cases with regard to

24  the Officer's participation and whether they caused,

25  instigated, or participated in Ms. Gallego's detention.

1          So Mr. Napoleon, how much time do you need to file an

2     amended complaint with regard to Counts 1 and 2?

3          MR. NAPOLEON:  Two weeks.

4          THE COURT:  Two weeks?

5          MR. NAPOLEON:  Yes, Your Honor, please.

6          THE COURT:  All right.  So obviously today is the

7     11th.  So that would take us to March 25th, if you'll file the

8     amended complaint.

9          And Mr. Greenberg, yes, the Court will allow the stay

10    until the complaint is filed and the Defendants have responded.

11         MR. NAPOLEON:  Thank you, Your Honor.

12         THE COURT:  Is there anything further?

13         MR. GREENBERG:  I just want to clarify.  The stay will

14    be in effect until the Court denies qualified immunity,

15    correct?

16         THE COURT:  That's correct.

17         MR. GREENBERG:  Oh, okay.

18         Thank you, Your Honor.

19         THE COURT:  I'm just making the point there will be a

20    response.

21         MR. GREENBERG:  Of course.

22         THE COURT:  Okay.  Is there anything further?

23         MR. NAPOLEON:  No, Your Honor.  I would love to just

24    say one last thing.  Hello to Ms. Gariazzo.  It's been a long

25    time and it's good to see that you're doing well.

1          THE COURT:  So that everyone knows, Liz Gariazzo is my

2     courtroom deputy.  I had the pleasure of working with Liz as my

3     judicial assistant for 10 years when I was in state court, and

4     we had the opportunity to see Mr. Napoleon when we were in

5     state court, as well as Mr. Jauregui.  It's good to see each of

6     you.

7          MR. NAPOLEON:  Thank you, Your Honor.

8          THE COURT:  All right.  Take care, everyone, and it

9     was a pleasure.  Thank you for your time and your thoughtful

10    argument.  Be well.

11         MS. COHEN:  Bye, Judge.

12         MR. GREENBERG:  Thank you, Your Honor.

13         THE COURT:  Take care.

14       (Proceedings concluded at 10:44 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1    UNITED STATES OF AMERICA      )

2    ss:

3    SOUTHERN DISTRICT OF FLORIDA  )

4                   C E R T I F I C A T E

5           I, Yvette Hernandez, Certified Shorthand Reporter in

6    and for the United States District Court for the Southern

7    District of Florida, do hereby certify that I was present at

8    and reported in machine shorthand the proceedings had the 11th

9    day of March, 2021, in the above-mentioned court; and that the

10   foregoing transcript is a true, correct, and complete

11   transcript of my stenographic notes.  Please note:  This

12   hearing occurred during the COVID-19 pandemic and is therefore

13   subject to the technological limitations of reporting remotely.

14          I further certify that this transcript contains pages

15   1 - 30.

16          IN WITNESS WHEREOF, I have hereunto set my hand at

17   Miami, Florida this 25th day of March, 2021.

18

19                        /s/Yvette Hernandez
                          Yvette Hernandez, CSR, RPR, CLR, CRR
20                        400 North Miami Avenue, 10-2
                          Miami, Florida 33128
21                        (305) 523-5698
                          yvette_hernandez@flsd.uscourts.gov
22

23

24

25