# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CIVIL DIVISION

CASE NO.: 20-cv-24374-BB

MARGLLI GALLEGO,

    Plaintiff,

v.

IVETTE PEREZ, CARLOS LUFFI,
RICKY GARCIA, FLAVIO ESCOBAR,
all individually, and who are all residents
of the State of Florida,

    Defendants.
_____/

## AMENDED COMPLAINT

Plaintiff, MARGLLI GALLEGO, files this Amended Complaint against Defendants IVETTE PEREZ, CARLOS LUFFI, RICKY GARCIA and FLAVIO ESCOBAR in their individual capacities and allege the following:

## THE PARTIES, JURISDICTION, AND VENUE

At all times material to this action:

1. Plaintiff, Marglli Gallego, ("Ms. Gallego"), was a citizen of the State of Florida, and a resident of Miami-Dade County, Florida.

2. Defendant, Ivette Perez, ("Officer Perez"), was a resident the State of Florida, and a police officer with the Miami-Dade County Police Department.

3. Defendant, Carlos Luffi, ("Sergeant Luffi"), was a resident the State of Florida, and a sergeant with the Miami-Dade County Police Department.

4. Defendant, Ricky Garcia, ("Officer Garcia"), was a resident the State of Florida, and a police officer with the Miami-Dade County Police Department.

5. Defendant, Flavio Escobar, ("Officer Escobar"), was a resident the State of Florida, and a police officer with the Miami-Dade County Police Department.

6. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983. Venue is proper because the events giving rise to this claim all occurred within Miami-Dade County, Florida.

## THE FACTS GIVING RISE TO THE CLAIM

*Background Information*

7. Ms. Gallego is an owner of a condominium unit that is part of a master condominium association named Hammocks Community Association, Inc. (the "Hammocks").

8. The Hammocks has a total of 44 subordinate associations.

9. The Hammocks is responsible for maintaining the land, sidewalks, gates, and streets of the 44 subordinate associations, which stretches over 3,500 acres of land in Southwest Miami-Dade County.[1]

10. The Hammocks also has 6,537 residential units, including single-family homes, townhomes, and condominiums.

11. Ms. Gallego is and has been on the Board of Directors of the Hammocks since 2015. She served as Treasurer from 2015 through 2017, and as President from 2018 to the present day.

12. Officer Perez and Sergeant Luffi are assigned to the Miami-Dade Police Department Economic Crimes Unit.

---

[1] The Hammocks is also responsible for managing 18 individual communities.

13. Sergeant Luffi is Officer Perez's direct supervisor and has the authority to control the performance of her work duties.

14. For the last three years, Officer Perez and Sergeant Luffi have made false, malicious, bad-faith, and defamatory statements about Ms. Gallego to other property owners, vendors, and contractors.

15. For instance, Officer Perez and Sergeant Luffi have publicly told property owners, vendors and contractors that Ms. Gallego is stealing money from the Hammocks and is going to jail.

16. Sergeant Luffi went so far as to confront a Hammocks contractor who was defending an unrelated civil injunction case (*i.e.*, a restraining order).

17. Sergeant Luffi approached the contractor outside of the courthouse and demanded that the contractor "say something" against Ms. Gallego.

18. Sergeant Luffi offered to "help him out" in return.

19. The contractor believed that Sergeant Luffi's heavy-handed invitation to "say something" against Ms. Gallego was a bad-faith solicitation to falsely accuse her of a crime.

20. It is important to note that the contractor was represented by an attorney at the time.

21. Sergeant Luffi knew, or should have known, that it was improper for him to confront a represented defendant outside of a courthouse and essentially offer him a quasi-cooperation agreement.

22. Officer Perez and Sergeant Luffi also falsely and maliciously told contractors and vendors of the Hammocks that Ms. Gallego was involved in an illegal "kick-back" scheme and was going to jail.

23. Officer Perez and Sergeant Luffi threatened those same vendors with jail time unless they "cooperated" with them in their investigation against Ms. Gallego.

24. Ms. Gallego was aware of all of the malicious statements made by Officer Perez and Sergeant Luffi, as listed above.

25. Officer Perez and Sergeant Luffi's actions and statements were outside the scope of their duties and made in bad faith.

*Facts of this Incident*

26. On March 6, 2018, the Hammocks held an election for the Board of Directors.

27. It is important to note that, well before the March 6, 2018 election, the Hammocks paid "off-duty"[2] Miami-Dade County police officers to provide general security for the association.

28. Off-duty officers who worked for the Hammocks were required to wear their full uniform.

29. Whenever elections were held, the Hammocks always directed at least one off-duty police officer to station himself outside of the main door of the association clubhouse (the location of the elections).

30. At times, the off-duty officers stationed outside would enter the clubhouse during elections for various reasons. Some off-duty officers were also posted inside of the clubhouse during the election.

31. Before the elections begin, the off-duty officers were introduced to the Board of Directors and staff members who were present at the election.

---

[2] The officers are not technically "off-duty." They are working in an overtime capacity, but are being paid by the Hammocks.

4

32. If fact, most board members and staff wore t-shirts or polo shirts with the Hammocks logo on it.

33. The Hammocks management informed all off-duty officers at the election to assist with crowd control and any aggressive individuals who may show up. During prior elections, some individuals became upset when their names were not on the voter rolls.

34. Since the elections were not open to the public, the Board and management also informed the off-duty officers to prevent anyone who is not a member of the association from entering the clubhouse.

35. During the March 6, 2018 election, Officer Garcia and Officer Escobar were working at the Hammocks in an off-duty capacity.

36. Officer Garcia's primary responsibility was to guard the front door of the clubhouse during the election.

37. Officer Escobar was more of a rover that day and did whatever was needed during the election.

38. The Hammocks management told Officer Garcia and Officer Escobar to stop anyone from entering the clubhouse who was not a member of the Hammocks.

39. The Hammocks left a membership list at the front entrance to assist the officers.

40. At approximately 6:40 p.m., Officer Perez, Sergeant Luffi and another unknown police officer parked directly in front of the Hammocks clubhouse in unmarked police vehicles.

41. All three of officers were in plain clothes, but had their guns on their waists, and their badges hanging from their necks.

42. At approximately 6:45 p.m., Officer Perez, Sergeant Luffi, and the unknown officer had a 10-15 minute conversation with Officer Garcia and Officer Escobar outside of the clubhouse.

43. During their conversation, Officer Perez and Sergeant Luffi told Officer Garcia that they were going to arrest Ms. Gallego, which Officer Garcia later admitted.

44. Accordingly, Officer Garcia felt compelled to allow Sergeant Luffi, Officer Perez, and the unknown officer to enter the Hammocks election, which happened around 7:00 p.m., right as voting booths were closing.

45. It is important to note that Sergeant Luffi has supervisory control over Officer Garcia and Officer Escobar, even in their off-duty capacity.

46. Joel Mercado (a former corrections officer) was the property manager for the Hammocks at the time.

47. Mr. Mercado noticed Officer Perez, Sergeant Luffi, and the unknown officer walk inside of the clubhouse.

48. Officers Garcia and Escobar also entered at this time, since the voting period had just ended.

49. Mr. Mercado immediately approached Officer Perez, Sergeant Luffi, and the unknown officer and told them that the election was closed to the public.

50. Mr. Mercado then told the three officers that they were not allowed to be present inside and had to leave.

51. Sergeant Luffi laughed at Mr. Mercado and stated in a condescending tone, "What are you going to do about it?"

52. Officers Garcia and Escobar were in close proximity to Sergeant Luffi when he laughed and made the abovementioned statement.

53. Officer Perez, Sergeant Luffi, and the unknown officer then walked over to the election ballot box and attempted to confiscate it.

54. Mr. Mercado told them that they could not take the closed, un-tabulated election ballots.

55. Ms. Gallego, the President of the Hammocks, also walked over and told Officer Perez, Sergeant Luffi, and the unknown officer that they were not allowed to be present and had to leave.

56. Officer Perez, Sergeant Luffi, and the unknown officer refused Ms. Gallego's request.

57. Again, Officers Garcia and Escobar were in close proximity and overheard the conversation.

58. Officer Perez and Sergeant Luffi continuously demanded that Mr. Mercado and Ms. Gallego allow them to take the ballots.

59. Mr. Mercado and Ms. Gallego continuously refused Officer Perez and Sergeant Luffi's warrantless demand.

60. Attorney Santiago Eljaiek, Esq. represented the Hammocks at the time and responded to the election site.

61. Mr. Eljaiek told Officers Perez and Sergeant Luffi that they could not remove the ballots without a warrant.

62. Officer Perez and Sergeant Luffi did not have probable cause to believe that a crime occurred, nor did they have a search warrant to confiscate the ballots.

63. Since the voting had concluded, the members of the association began to open and tabulate the votes.

64. This is a long and tedious process. Over 2,000 votes were cast and there were several people running for different seats on the Board.

65. No outside individuals were allowed to be present during the counting process unless he or she was a member of the Hammocks or part of the staff.

66. Nevertheless, Officer Perez, Sergeant Luffi, and the unknown officer hovered around the vote counting process.

67. Officer Perez, Sergeant Luffi, and the unknown officer were told again to leave, but they refused.

68. Officers Garcia and Escobar were standing in close proximity and heard them refuse to leave.

69. Based on Officer Perez and Sergeant Luffi's history of malicious acts, their highly suspicious act of attempting to seize the ballot box without a warrant or probable cause, and their refusal to leave when told to do so, Ms. Gallego told Sergeant Luffi that he must be a relative of someone who does not want her on the Board.

70. Officer Perez immediately interjected and stated, "How do you know that? Why did you say that?"

71. Officer Perez told Ms. Gallego something along the lines of, "I can't wait to put you in a chair and ask you questions."

72. Ms. Gallego responded, "I am represented by a lawyer, you can't do that."[3]

73. Within seconds of Officer Perez's threatening statement, Officer Garcia, who was present during the conversation and heard what Officer Perez said, then immediately pushed Ms. Gallego away and told her to "sit down in this chair right now and don't move."

---

[3] By the time the 2018 election occurred, Officers Perez and Luffi had slandered, harassed, and threatened Ms. Gallego for approximately two years, which caused Ms. Gallego to hire a criminal defense attorney. Officer Perez and Luffi knew this fact because they had spoken to him on previous occasions.

74. Ms. Gallego sat down in the chair as directed.

75. Officers Garcia and Escobar then sat down on chairs that were located on each side of Ms. Gallego.

76. Both officers sat in very close proximity to Ms. Gallego, essentially "sandwiching" her.

77. Officer Perez's statement clearly instigated, encouraged, incited, caused or contributed to Officer Garcia and Officer Escobar's illegal detention of Ms. Gallego.

78. Officer Perez's statement clearly had an effect on Officers Garcia and Escobar because, in addition to saying, "I can't wait to put you in a chair," she and Sergeant Luffi had just told Officers Garcia and Escobar that they were going to arrest Ms. Gallego.

79. It is important to note that neither Officer Garcia nor Officer Escobar tasered Ms. Gallego, slammed her to the ground, or make her wait outside.

80. Officers Garcia and Escobar did exactly as Officer Perez wished, *i.e.* put Ms. Gallego" in a chair."

81. Officer Garcia and Escobar's actions were reasonably related to Officer Perez's statement.

82. Furthermore, Officers Garcia and Escobar were clearly not acting solely on their own volition.

83. Ms. Gallego was the President of the Hammocks – the organization paying for Officer Garcia and Escobar's presence.

84. In fact, when this incident occurred, Officers Garcia and Escobar had already earned a significant amount of money by working at the Hammocks.

9

85. There is no way possible that Officer Perez's statement and action did not influence or encourage Officer Garcia and Escobar's action of detaining the head of their off-duty employer.

86. Sergeant Luffi also instigated, encouraged, incited, contributed or caused the illegal detention.

87. When Officer Garcia and Escobar first detained Ms. Gallego, Sergeant Luffi lifted up his untucked shirt and flashed his handcuffs in their direction.

88. Officers Garcia and Escobar could clearly see their sergeant's actions.

89. Sergeant Luffi intentionally flashed his handcuffs numerous times in Officer Garcia and Escobar's direction while they detained Ms. Gallego.

90. Sergeant Luffi's repeated flashing of his handcuffs was clearly a signal to Officers Garcia and Escobar - both of whom are subordinate officers - to keep Ms. Gallego detained.

91. Sergeant Luffi's act of flashing his handcuffs undoubtedly instigated or contributed to Officer Garcia and Escobar prolonging the detention of Ms. Gallego.

92. Furthermore, Sergeant Luffi's act of flashing handcuffs is reasonably related to Officer Garcia and Escobar's prolonged detention.

93. Sergeant Luffi's act confirmed what he had previously told Officers Garcia and Escobar, i.e. that he was going to arrest Ms. Gallego.

94. Furthermore, Officers Garcia and Escobar were clearly not acting solely on their own volition.

95. There is no way possible that Sergeant Luffi's statements throughout the night and his accompanying actions did not influence or encourage Officer Garcia and Escobar's detention of the head of their off-duty employer.

10

96. Sergeant Luffi's actions also signaled to Ms. Gallego that she was not free to leave, even though she was the President of the Board and involved in conducting an election.

97. Sergeant Luffi's act of flashing his handcuffs was clearly a sign to Garcia and Escobar because they detained Ms. Gallego in the same chair for virtually the entire counting process, which last approximately *four and ½ hours*.

98. It is important to note that, during the four hours, Officer Perez came over multiple times and told Ms. Gallego, "I'm am going to be able to ask you questions!"

99. Ms. Gallego was not allowed to use the restroom, nor was she provided with food or water.

100. Again, Ms. Gallego was the Board President of the Hammocks.

101. There is no way that Garcia and Escobar would have detained Ms. Gallego in such a fashion without the influence of Sergeant Luffi and Officer Perez.

102. Proof of this point is that Ms. Gallego was not told that she could get up until Sergeant Luffi and Officer Perez departed the premises, which was after the count had ended.

103. When Officer Perez and Sergeant Luffi finally exited the property, Officer Garcia shrugged his shoulders.

104. The look Garcia's face indicated, "Oh well, I tried."

105. There was absolutely no evidence whatsoever that anyone had tampered with the ballots, let alone Ms. Gallego.

106. Ms. Gallego never committed a crime, nor had she been accused of committing a crime.

107. In fact, none of the officers involved even alleged that election fraud had occurred or was occurring.

108. Perez and Luffi sufficiently instigated, encouraged, incited, contributed to or caused Ms. Gallego's illegal detention by, *inter alia*, confronting her in a place that they had no right to be, refusing to leave when told to do so, dangling handcuffs in front of her, and saying, "I can't wait to put you in chair and ask you questions." Perez and Luffi are not absolved of liability simply because two other police officers "sandwiched" Ms. Gallego in a chair.

109. Although Perez and Luffi did not physically detain Ms. Gallego like the other officers involved here, Perez and Luffi has undoubtedly *caused*, *instigated* or *participated* in making Ms. Gallego feel as if she was not free to leave.

110. Luffi and Perez are just as responsible as Garcia and Escobar.

## COUNT I

## DEPRIVATION OF CIVIL RIGHTS
## FOURTH AMENDMENT VIOLATION
## UNLAWFUL TERRY STOP – OFFICER IVETTE PEREZ

111. Ms. Gallego re-alleges the allegations contained in paragraphs 1-110 of this Complaint.

112. This action is brought by Ms. Gallego pursuant to Title 42, Section 1983, United States Code, for the deprivation of her Civil Rights caused by Miami-Dade County Police Officer Ivette Perez, in her individual capacity.

113. Officer Perez intentionally committed acts that violated Ms. Gallego's Fourth Amendment right not to be subjected to an unreasonable or prolonged investigatory stop.

114. No reasonable police officer could have believed that Ms. Gallego was involved, or was about to become involved, in criminal activity.

115. Officer Perez's instigation and/or participation in these events caused or contributed to the prolonged stop and detention, which was not reasonable in scope.

116. The law enforcement purpose served by the stop (or lack thereof), the diligence with which the Officer Perez pursued the investigation, and the length of the stop was not reasonable based on the totality of circumstances.

117. No reasonable person would have felt free to leave.

118. Officer Perez's conduct caused injury to Ms. Gallego, which was a reasonably foreseeable consequence of her conduct.

119. Officer Perez was acting under color of state law as a police officer when she committed such acts, even though her acts were outside the limits of lawful authority.

## COUNT II

### DEPRIVATION OF CIVIL RIGHTS
### FOURTH AMENDMENT VIOLATION
### UNLAWFUL TERRY STOP – CARLOS LUFFI

120. Ms. Gallego re-alleges the allegations contained in paragraphs 1-110 of this Complaint.

121. This action is brought by Ms. Gallego pursuant to Title 42, Section 1983, United States Code, for the deprivation of her Civil Rights caused by Miami-Dade County Police Officer Carlos Luffi, in his individual capacity.

122. Officer Luffi intentionally committed an act that violated Ms. Gallego's Fourth Amendment right not to be subjected to an unreasonable or prolonged investigatory stop.

123. No reasonable police officer could have believed that Ms. Gallego was involved, or was about to become involved, in criminal activity.

124. Sergeant Luffi's instigation and/or participation in these events caused or contributed to the prolonged stop and detention, which was not reasonable in scope.

125. The law enforcement purpose served by the stop (or lack thereof), the diligence with which the Officer Luffi pursued the investigation, and the length of the stop was not reasonable based on the totality of circumstances.

126. No reasonable person would have felt free to leave.

127. Officer Luffi's conduct caused injury to Ms. Gallego, which was a reasonably foreseeable consequence of his conduct.

128. Officer Luffi was acting under color of state law as a police officer when he committed such acts, even though his acts were outside the limits of lawful authority.

## COUNT III

### DEPRIVATION OF CIVIL RIGHTS
### FOURTH AMENDMENT VIOLATION
### UNLAWFUL TERRY STOP – RICKY GARCIA

129. Ms. Gallego re-alleges the allegations contained in paragraphs 1-110 of this Complaint.

130. This action is brought by Ms. Gallego pursuant to Title 42, Section 1983, United States Code, for the deprivation of her Civil Rights caused by Miami-Dade County Police Officer Ricky Garcia, in his individual capacity.

131. Officer Garcia intentionally committed an act that violated Ms. Gallego's Fourth Amendment right not to be subjected to an unreasonable or prolonged investigatory stop.

132. No reasonable police officer could have believed that Ms. Gallego was involved, or was about to become involved, in criminal activity.

133. Officer Garcia's stop and detention was not reasonable in scope.

134. The law enforcement purpose served by the stop (or lack thereof), the diligence with which the Officer Garcia pursued the investigation, and the length of the stop was not reasonable based on the totality of circumstances.

135. No reasonable person would have felt free to leave.

136. Officer Garcia's conduct caused injury to Ms. Gallego, which was a reasonably foreseeable consequence of his conduct.

137. Officer Garcia was acting under color of state law as a police officer when he committed such acts, even though his acts were outside the limits of lawful authority.

## COUNT IV

### DEPRIVATION OF CIVIL RIGHTS
### FOURTH AMENDMENT VIOLATION
### UNLAWFUL TERRY STOP – FLAVIO ESCOBAR

138. Ms. Gallego re-alleges the allegations contained in paragraphs 1-110 of this Complaint.

139. This action is brought by Ms. Gallego pursuant to Title 42, Section 1983, United States Code, for the deprivation of her Civil Rights caused by Miami-Dade County Police Officer Flavio Escobar, in his individual capacity.

140. Officer Escobar intentionally committed an act that violated Ms. Gallego's Fourth Amendment right not to be subjected to an unreasonable or prolonged investigatory stop.

141. No reasonable police officer could have believed that Ms. Gallego was involved, or was about to become involved, in criminal activity.

142. Officer Escobar's stop and detention was not reasonable in scope.

143. The law enforcement purpose served by the stop (or lack thereof), the diligence with which the Officer Escobar pursued the investigation, and the length of the stop was not reasonable based on the totality of circumstances.

144. No reasonable person would have felt free to leave.

145. Officer Escobar's conduct caused injury to Ms. Gallego, which was a reasonably foreseeable consequence of his conduct.

146. Officer Escobar was acting under color of state law as a police officer when he committed such acts, even though his acts were outside the limits of lawful authority.

WHEREFORE, Plaintiff, Marglli Gallego, demands judgment for her economic and noneconomic damages, attorney's fees, the costs of prosecuting this action, and any other relief this Court deems proper and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff, Marglli Gallego demands a jury trial of all issues so triable as of right by a jury.

DATED: March 25, 2021

> RASCO KLOCK PEREZ NIETO
> *Counsel for the Plaintiff, Marglli Gallego*
> 2555 Ponce de Leon Blvd., Suite 600
> Coral Gables, Florida 33134
> Telephone: 305.476.7100
> Facsimile: 305-476-7102
> Email: hnapoleon@rascoklock.com
>
>
> By: /s/ *Hilton Napoleon, II*
>   Hilton Napoleon, II
>   Fla. Bar No.: 17593