## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 20-cv-24374-BB

MARGLLI  GALLEGO,

     Plaintiff,

v.

IVETTE PEREZ, CARLOS LUFFI,
RICKY GARCIA, FLAVIO ESCOBAR,
all individually, and who are all residents
of the State of Florida,

     Defendants.

_____/

### PLAINTIFF'S RESPONSE IN OPPOSITION TO PEREZ AND LUFFI'S
### MOTION TO DISMISS SECOND AMENDED COMPLAINT

Plaintiff, Marglli Gallego ("Mrs. Gallego"), files this *Response in Opposition to Defendant Ivette Perez and Carlos Luffi's Motion to Dismiss Second Amended Complaint*, see [D.E. 53], and states the following:

### INTRODUCTION

Defendants Ivette Perez ("Perez" or "Officer Perez") and Carlos Luffi ("Luffi" or "Sergeant Luffi") argue that they are entitled to qualified immunity regarding Ms. Gallego's illegal detention on March 6, 2018, which lasted approximately four and a half hours while she was supposed to be conducting an election.  In their motion to dismiss, Perez and Luffi rely heavily upon the fact that they never "instructed," "directed," "requested," or "commanded" Officer Garcia or Officer Escobar to illegally detain Ms. Gallego in a chair for four and a half hours.  See [D.E

53, pg. 6].   However, Perez and Luffi clearly misidentify the legal issue in this case.[1]   The issue

here is not whether Perez and Luffi *commanded* or *ordered* Ms. Gallego's illegal detention, but

whether they *instigated, encouraged, incited, caused, or participated* in her illegal detention.   The

Eleventh Circuit clearly established long ago that officers who sufficiently *instigate, encourage,*

*incite, cause, or participate* in an illegal detention are just as liable as officers who ultimately

detain the individual.   See *Jordan v. Mosley*, 487 F.3d 1350, 1354 (11th Cir. 2007) ("In this Circuit,

a non-arresting officer who instigates or causes an unlawful arrest can still be liable under the

Fourth Amendment."); *Wilkerson v. Seymour*, 736 F.3d 974, 980 (11th Cir. 2013) ("What is made

explicit in *Jones* is that a participant in an arrest, even if not the arresting officer, may be liable if

he knew the arrest lacked any constitutional basis and yet participated in some way.").   Here,

viewing the evidence in the light most favorable to Mrs. Gallego, Perez and Luffi sufficiently

instigated encouraged, incited, caused or participated in her illegal detention on March 6, 2018.

Accordingly, qualified immunity is inapplicable.

## FACTS

When this incident occurred, Mrs. Gallego was the President of the Board of Directors for

the Hammocks Community Association, Inc. ("Hammocks").[2]   [D.E. 46, ¶ 17].   Officer Perez and

Sergeant Luffi were assigned to the Miami-Dade Police Department Economic Crimes Unit.   *Id.*

at ¶ 18.   Sergeant Luffi is Officer Perez's direct supervisor and has the authority to control her

---

[1] Quite frankly, it goes without saying that a police officer who *commands* or *orders* another
police officer to illegally detain an individual without probable cause is undoubtedly liable in a
civil rights action.

[2] The Hammocks is the largest homeowners association in Florida.   [D.E. 46, ¶8].   The Hammocks
encompasses over 3,800 acres of land, waterways, and beaches in Southwest Miami-Dade County.
*Id.* at ¶ 9.   It has 6,537 residential units, including single-family homes, townhomes, and
condominiums.   *Id.* at ¶ 10.   If the Hammocks were a city, its land area would be larger than Miami
Shores, Key Biscayne, and El Portal **combined**.   *Id.* at ¶ 11.

work duties.  *Id.* at ¶ 19.  For the past three to four years, Perez and Luffi have made false, malicious, bad-faith, and defamatory statements about Mrs. Gallego to other property owners, vendors, and contractors.  *Id.* at ¶ 20.

For instance, before the incident giving rise to this lawsuit occurred, Perez and Luffi told property owners, vendors and contractors that Mrs. Gallego is stealing money from the Hammocks and that she is going to jail.  *Id.* at ¶ 21.  Sergeant Luffi went so far as to confront a Hammocks contractor outside of a courthouse and demanded that the contractor "say something" against Mrs. Gallego.  *Id.* at ¶ 23.  Luffi offered to "help him out" in return.  *Id.* at ¶ 24.  Luffi's heavy-handed invitation to "say something" against Mrs. Gallego was a bad-faith solicitation to falsely accuse her of a crime.[3]  *Id.* at ¶ 25.

Perez and Luffi also falsely and maliciously told contractors and vendors of the Hammocks that Mrs. Gallego was involved in an illegal "kick-back" scheme and was going to jail.  *Id.* at ¶ 28.  Perez and Luffi threatened those same vendors with jail time unless they "cooperated" with them in their investigation against Mrs. Gallego.  *Id.* at ¶ 29.  Mrs. Gallego was aware of all of the malicious statements and actions by Perez and Luffi, as listed above.  *Id.* at ¶ 30.

On March 6, 2018, the Hammocks held an election for the Board of Directors.  *Id.* at ¶ 32. The Hammocks hired Officer Garcia and Officer Escobar, both from the Miami-Dade Police Department, as "off-duty"[4] police officers.  *Id.* at ¶ 33, 41.  Since the election was not open to the public, the Hammocks informed Officer Garcia and Escobar to prevent anyone who is not a

---

[3] It is important to note that Sergeant Luffi knew that the contractor was represented by an attorney at the time, and that it was improper for him to confront a represented defendant outside of a courthouse and essentially offer him a quasi-cooperation agreement.
[4] The officers are not technically "off-duty."  They are working in an overtime capacity, but are being paid by the Hammocks.

member of the association from entering the clubhouse.  *Id.* at ¶ 41.  They also provide general security for the election.  *Id.* at ¶ 42-45.

At approximately 6:40 p.m., Officer Perez, Sergeant Luffi and an unknown police officer parked directly in front of the Hammocks clubhouse in unmarked police vehicles.  *Id.* at ¶ 46.  All three officers were in plain clothes, but had their guns on their waists, and their badges hanging from their necks.  *Id.* at ¶ 47.  Perez, Luffi, and the unknown officer had a 10-15 minute conversation with Officer Garcia and Officer Escobar outside of the clubhouse.  *Id.* at ¶ 48.  During their conversation, Perez and Luffi told Officer Garcia that they were going to arrest Mrs. Gallego.[5] *Id.* at ¶ 49.   Officer Garcia felt compelled[6] to allow Sergeant Luffi (a higher-ranking officer), Officer Perez, and the unknown officer to enter the Hammocks election, although they had no independent right to be present.  *Id.* at ¶ 51.

Joel Mercado (a former corrections officer) was the property manager for the Hammocks at the time and noticed Perez, Luffi, and the unknown officer walk inside of the clubhouse.  *Id.* at ¶ 53.  Officers Garcia and Escobar also entered during this time, since the voting period had just ended.  *Id.* at ¶ 55.  Mr. Mercado immediately approached Perez, Luffi, and the unknown officer and told them that the election was closed to the public and that they had to leave.  *Id.* at ¶ 56, 57.  Sergeant Luffi laughed at Mr. Mercado and stated in a condescending tone, "What are you going to do about it?"  *Id.* at ¶ 58.  Officers Garcia and Escobar heard Sergeant Luffi laugh and make the condescending statement.  *Id.* at ¶ 59.

---

[5] Officer Garcia later admitted on video that he believed Officer Perez and Sergeant Luffi showed up to arrest Mrs. Gallego.  *Id.* at ¶ 50.
[6] Sergeant Luffi has supervisory control over Officer Garcia and Officer Escobar, even in their "off-duty" capacity.

Perez, Luffi, and the unknown officer then walked over to the election ballot box and attempted to confiscate it.  *Id.* at ¶ 60.  Mr. Mercado told them that they could not take the closed, un-tabulated election ballots.  *Id.* at ¶ 61.  Mrs. Gallego, the President of the Hammocks at the time, also walked over and told Perez, Luffi, and the unknown officer that they were not allowed to be present and had to leave.  *Id.* at ¶ 62.  The three officers refused.  *Id.* at ¶ 63.  Officers Garcia and Escobar were in close proximity and overheard the entire conversation, but did not ask Perez and Luffi (a superior officer) to leave as the Hammock's personnel directed. *Id.* at ¶ 64, 65.

Perez and Luffi continuously demanded that Mr. Mercado and Mrs. Gallego allow them to take the ballots, but they refused the warrantless demand.  *Id.* at ¶ 66, 67.  Attorney Santiago Eljaiek, Esq. represented the Hammocks at the time and responded to the election site.  *Id.* at ¶ 68.  Mr. Eljaiek told Perez and Luffi that they could not remove the ballots without a warrant, as they did not have probable cause to believe that a crime occurred, nor did they have a search warrant to confiscate the ballots. *Id.* at ¶ 69, 70.

Since the voting had concluded, the members of the association began to open and tabulate the votes.[7]  *Id.* at ¶ 71.  No outside individuals were allowed to be present during the counting process, only residents of the Hammocks or the staff.  *Id.* at ¶ 73.  Perez, Luffi, and the unknown officer hovered around the vote counting process.  *Id.* at ¶ 74.  They were told again to leave, but again refused.  *Id.* at ¶ 75.  Officers Garcia and Escobar were standing in close proximity and heard Perez and Luffi refuse to leave.  *Id.* at ¶ 76.

Based on Perez and Luffi's history of malicious acts, their highly suspicious act of attempting to seize the ballot box without a warrant or probable cause, and their refusal to leave

---

[7] This is a long and tedious process.  Over 2,000 votes were cast and there were several people running for different seats on the Board.  *Id.* at ¶ 72.

when told to do so, Mrs. Gallego told Sergeant Luffi that he must be a relative of someone who does not want her on the Board.[8]  *Id.* at ¶ 77.  Officer Perez immediately interjected and stated, "How do you know that?  Why did you say that?"  *Id.* at ¶ 78.  Officer Perez told Mrs. Gallego something along the lines of, "I can't wait to put you in a chair and ask you questions."  *Id.* at ¶ 79.  Mrs. Gallego immediately responded, "I am represented by a lawyer, you can't do that."[9]  *Id.* at ¶ 80.  As Mrs. Gallego was saying, "you can't do that," Officer Garcia immediately pushed Mrs. Gallego away and told her to "sit down in this chair right now and don't move."[10]  *Id.* at ¶ 81.  Mrs. Gallego sat down in the chair as directed.  *Id.* at ¶ 82.  Officers Garcia and Escobar then sat down on chairs that were located on each side of Mrs. Gallego.  *Id.* at ¶ 83.  Officers Garcia and Escobar sat in very close proximity to Mrs. Gallego, essentially "sandwiching" her.  *Id.* at ¶ 84.

While Mrs. Gallego was sandwiched between two officers, Sergeant Luffi repeatedly lifted up his untucked shirt and flashed his handcuffs in their direction.  *Id.* at ¶ 95, 97.  Officers Garcia and Escobar could clearly see their sergeant's actions.  *Id.* at ¶ 96.  Luffi's act confirmed what he had just told Officer Garcia outside of the clubhouse, *i.e.* that they planned to arrest Mrs. Gallego.  A reasonable jury could easily infer that Sergeant Luffi's repeated flashing of his handcuffs was a

---

[8] It is important to note that, before the 2018 election, Sergeant Luffi had accompanied a Hammocks homeowner to the management office and threatened the management team if they did not provide the homeowner with the requested documents.  Mrs. Gallego found it odd that a police sergeant would accompany a private citizen on an in-person document request to his homeowner's association.  Moreover, Sergeant Luffi conversed and congregated with this very same homeowner during the 2018 election for an extended period of time.

[9] By the time the 2018 election occurred, Officers Perez and Luffi had slandered, harassed, and threatened Mrs. Gallego for approximately two years, which caused Mrs. Gallego to hire a criminal defense attorney.  Officer Perez and Luffi knew this fact because they had spoken to him on previous occasions.

[10] Officer Garica heard what Officer Perez said, i.e. I can't wait to put you in a chair and ask you questions.  A reasonable jury could infer that Perez's statement, along with their conversation outside confirming Ms. Gallego's upcoming arrest (at least supposedly), clearly influenced Garcia's actions.

signal to Officers Garcia and Escobar - both of whom are subordinate officers - to keep Mrs. Gallego detained.  *Id.* at ¶ 98.

Mrs. Gallego remained in the same chair for the entire counting process, which last approximately *four and ½ hours*.  *Id.* at ¶ 105.  Mrs. Gallego was not allowed to use the restroom, nor was she provided with food or water, even though she was the Board President.  *Id.* at ¶ 106.  During the four hour detention, Officer Perez came over multiple times and told Mrs. Gallego, "I'm am going to be able to ask you questions!" *Id.* at ¶ 107.

Mrs. Gallego was not ultimately allowed to get up until Sergeant Luffi and Officer Perez departed the premises, which was after the count had ended.  *Id.* at ¶ 109.  When Officer Perez and Sergeant Luffi finally exited the property, Officer Garcia shrugged his shoulders.  *Id.* at ¶ 110.  The look on Garcia's face indicated, "Oh well, I tried to help you."  *Id.* at ¶ 111.

Officers Garcia and Escobar were clearly not acting solely on their own volition.  *Id.* at ¶ 90.  Mrs. Gallego was the President of the Hammocks – the organization paying for Officer Garcia and Escobar's presence.  *Id.* at ¶ 91.  In fact, when this incident occurred, Officers Garcia and Escobar had already earned a significant amount of money by working at the Hammocks.  *Id.* at ¶ 92.  There is no way possible that Perez and Luffi's statements and actions, both inside and outside of the clubhouse, did not influence or encourage Officer Garcia and Escobar's action of detaining the head of their off-duty employer.  *Id.* at ¶ 93.  Viewing the evidence in the light most favorable to Mrs. Gallego, Perez and Luffi's actions clearly *instigate, encourage, incite, cause, or participate* in her illegal detention.[11]

---

[11] There was absolutely no evidence whatsoever that anyone had tampered with the ballots, let alone Mrs. Gallego.  *Id.* at ¶ 112.  Mrs. Gallego never committed a crime, nor had she been accused of committing a crime.  *Id.* at ¶ 113.  In fact, none of the officers involved even alleged that election fraud had occurred or was occurring. *Id.* at ¶ 114.

<u>**MEMORANDUM OF LAW**</u>

**I. Standard for Motion to Dismiss.**

As a preliminary matter, Federal Rule of Civil Procedure 8(a)(2) only calls for a "short plain statement of the claims showing that the pleader is entitled to relief." *See Johnson v. City of Shelby, Miss.,* 135 S. Ct. 346 (2014). A motion to dismiss is inappropriate unless the defendant can demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Wright v. Newsome,* 795 F.2d 964, 967 (11th Cir. 1986) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957)). Overall, the threshold is "exceedingly low" for a complaint to survive a motion to dismiss for failure to state a claim. *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 703 (11th Cir. 1985).

For the purposes of a motion to dismiss, the complaint is construed in the light most favorable to the plaintiff and all facts alleged by the plaintiff are accepted as true. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). Furthermore, *all inferences* must be viewed in the light most favorable to the plaintiff. *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014)("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.") quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011)("all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."); *Valdes v. Miami-Dade Cty.*, No. 12-22426-CIV, 2013 WL 5429938 *19 (S.D. Fla. Sept. 27, 2013) (Moreno, C.J. / Otazo-Reyes, M.J.), *aff'd*, 584 F. App'x 927 (11th Cir. 2014) ("[I]n order to make the determination that Miami–Dade County is asking for, the undersigned would have to make inferences in its favor, rather than construing [the allegations] in the light most favorable to the plaintiff," which is improper.).

Generally speaking, a motion to dismiss in a civil rights case must be denied when the complaint alleges a violation of a clearly established constitutional right.  *See Corbett v. Hickers,* 929 F.3d 1304, 1311 (11th Cir. 2019).   Whether or not the constitutional right was clearly established is a question of law reviewed "de novo, accepting the facts alleged in the complaint as true and drawing all reasonable inferences in the plaintiff's favor."  *Id.* at 1311; *see also Tolan*, 572 U.S. at 657 ("Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when … a court decides only the clearly-established prong of the standard.")

## II. Qualified Immunity.

Perez and Luffi claim that they are entitled to "qualified immunity."  Qualified immunity "shields government officials executing discretionary responsibilities from civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Courson v. McMillian*, 939 F.2d 1479, 1486 (11th Cir. 1991) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).

A trial court must evaluate the defense of qualified immunity by a two-step process.  First, a government official asserting the defense of qualified immunity must initially establish that he was acting within his discretionary authority.  *See Skop v. City of Atlanta,* 485 F.3d 1130 (11th Cir. 2007).  Next, if the official was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity.  *Id.*

To overcome a government official's qualified immunity defense, a plaintiff must show that: (1) the official's conduct violated a statutory or constitutional right; and (2) the violation of that right was "clearly established."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  The threshold question is whether the alleged facts demonstrate that the defendant violated any

constitutional right of the plaintiff. *See Dukes v. Miami-Dade Cty.*, 232 F. App'x 907, 911 (11th Cir. 2007). If a constitutional violation is properly alleged, the final step is to determine whether the right was clearly established. *Id.*

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). A clearly established right exists when "the state of the law gave the official fair warning that the alleged conduct was unconstitutional." *Hardigree v. Lofton*, 992 F.3d 1216, 1224 (11th Cir. 2021) (quoting Hope *v. Pelzer*, 536 U.S. 730, 740-741 (2002)); see also *Grayden v.* Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003). "There need not be a case on all fours with materially identical facts . . . so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights." *Salvato v. Miley,* 790 F. 3d 1286, 1294 (11th Cir. 2015)(citing *Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004)* (internal quotation marks and citation omitted); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

## III. The Constitutional Violation.

### a. *Mrs. Gallego's Position*

Mrs. Gallego alleged in her Complaint that Perez and Luffi (and others) illegally seized her for over four hours during the 2018 Hammock's election in violation of the Fourth Amendment. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures." U.S. Const. amend. IV. The Supreme Court held long ago that even a temporary detention is a seizure under the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1, 88

(1968).  Fourth Amendment protections attach to any prolonged detention of a person, including arrests and investigatory detentions.  *See Dunaway v. New York*, 442 U.S. 200, 214–15 (1979) ("Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed arrests or investigatory detentions."); see also *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003).  In fact, "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *West v. Davis*, 767 F.3d 1063, 1067–68 (11th Cir. 2014)(*Citing Terry*, 392 U.S. 1, 88).  "The restraint on one's freedom of movement does not have to endure for any minimum time period before it becomes a seizure for Fourth Amendment purposes." *Id.* at 1069.  According to the Supreme Court, "[t]he Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni–Ponce,* 422 U.S. 873, 878 (1975).

A police officer does not have to use physical force to seize an individual. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (A seizure occurs when "a reasonable person in the same situation would feel that he or she was not free to leave.").  Police officers may seize an individual by using "a show of authority." *See United States v. Perez*, 443 F.3d 772, 778 (11th Cir. 2006) (police officer who fired a weapon, even though it did not strike the person, used a show of authority); see also *California v. Hodari,* 499 U.S. 621, 626, n. 2 (1991); *United States v. House,* 684 F.3d 1173, 1199 (11th Cir. 2012).  Factors relevant to determine whether officers used a "show of authority" include, but are not limited to: whether a citizen's path is blocked or impeded; the length of detention; the number of police officers present; the display of weapons; any physical touching of the person; and the language and tone of voice used by the police. *See United States*

*v. De La Rosa,* 922 F.2d 675, 678 (11th Cir. 1991); *United States v. Perez*, 443 F.3d 772, 778 (11th Cir. 2006).

At the end of the day, however, courts must examine the totality of circumstances to determine whether a Fourth Amendment seizure occurred.  *D.C. v. Wesby*, 138 S. Ct. 577, 588 (2018)(the lower court erred in viewing "each fact in isolation, rather than as a factor in the totality of circumstances.") (internal citations omitted); *California v. Hodari D.,* 499 U.S. 621, 627 (1991).  "[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *See U.S. v. Baker,* 290 F.3d 1276, 1278 (11th Cir. 2002).  *See also Touzin v. Patriarca,* 2013 WL 6051062 (S.D. Fla. November 14, 2013).

The history between parties is also relevant regarding the totality of circumstances.  *Valdes v. Miami-Dade Cty.*, No. 12-22426-CIV, 2013 WL 5429938, at *4 (S.D. Fla. Sept. 27, 2013), *aff'd*, 584 F. App'x 927 (11th Cir. 2014).  In *Valdes*, the Plaintiff filed a § 1983 claim against several Miami-Dade police officers for violations that occurred on two separate occasions.  *Id*. at *1.  Before the second incident, the plaintiff filed an internal affairs complaint against two of the officers, including Martinez.  *Id*.  The Plaintiff alleged that the second incident (the false arrest) was because of his prior interactions and complaint against the officers.  The district court specifically noted, "Martinez had a history with the Plaintiff, a history which included an alleged beating and an internal affairs investigation initiated by Plaintiff."  *Id*. at *4.  The district court further stated:

> In light of the ***prior incident*** between the Plaintiff and Sergeant Martinez, and the ensuing Internal Affairs investigation, there is evidence in this case from which a jury could reasonably infer that Sergeant Martinez falsified information to ensure

Plaintiff's arrest and to ***obtain revenge*** for Plaintiff's filing a complaint with Internal Affairs.

*Id*. at \*6.  (emphasis added).  The district court clearly relied on the history between the parties in its ruling.  The Eleventh Circuit affirmed the district court's ruling based "on the reasoning in the thorough Report and Recommendation by the magistrate judge … and the Order Adopting Magistrate's Report and Recommendation, issued by the district judge. *See Valdes v. Miami-Dade Cty.*, 584 F. App'x 927, 928 (11th Cir. 2014).

As described above, Perez and Luffi have publicly made false and defamatory statements against Ms. Gallego for over three years and have told several people in the community that she is going to jail.  Ms. Gallego was undoubtedly aware of their statements.  The harassment became so intense that Ms. Gallego hired a criminal defense attorney to represent her, although she had neither been arrested nor charged with a crime.  Perez and Luffi even tried to get vendors and contractors to fraudulently "say something" about Ms. Gallego.

On March 6, 2018, the Hammocks Community Association held a private election for the Board of Directors.  The election was not open to the public, and only members of the association were allowed to be present.  Perez and Luffi showed up to the election unannounced with their badges out and guns on their side.  Perez and Luffi told Officer Garcia and Escobar that they (Perez and Luffi) intended to arrest Mrs. Gallego.  When Perez and Luffi went inside, they ignored repeated directives to leave the premises.  Luffi even told the Hammocks management in a condescending tone, "What are you going to do about it?"  Without probable cause to believe that a crime occurred, and without the presence of a search warrant, Perez and Luffi told Mrs. Gallego and other board members that they intended to confiscate the election box.  Mrs. Gallego told the Defendants not to touch the ballots.

13

Based on his history of malicious acts towards her, and the suspicious attempt to seize election ballots, Mrs. Gallego told Luffi that he must be related to someone who does not want her on the Board.   Officer Perez responded, "How do you know that? Why did you say that?"  Perez then told Mrs. Gallego something along the lines of "I can't wait to put you in a chair and ask you questions."

Officer Garcia, who was supposed to be working for the Hammocks, then pushed Mrs. Gallego away and told her to "sit down in this chair right now and don't move."  Officer Garcia and Officer Escobar sat on each side of Ms. Gallego in close proximity, essentially sandwiching her.   During this time, Luffi repeatedly lifted his shirt to flash his handcuffs at Ms. Gallego.  Perez repeatedly stated, "I'm going to be able to sit across from you and ask you questions."  Although Mrs. Gallego was the President of the Board, and lawfully holding an election, she was forced to sit in a chair for four and a half hours without food, water, or restroom privileges.  Perez and Luffi sufficiently participated in seizing Mrs. Gallego without probable cause or reasonable suspicion, which is a violation of the Fourth Amendment.  Again, the March 6, 2018 incident *and* the history of Perez and Luffi's actions are relevant to this inquiry.  Otherwise, we would be viewing the facts in isolation, which is contrary to the precedent listed above.

### b. Perez and Luffi's Argument

Perez and Luffi argue that they are entitled to qualified immunity because they did not physically detain Mrs. Gallego themselves during the four and a half hours that she sat in a chair. Perez and Luffi rely heavily upon the fact that they never "instructed," "directed," "requested," or "commanded" that Officer Garcia or Officer Escobar detain Mrs. Gallego.

Again, the issue is not whether Perez and Luffi *commanded* or *ordered* Ms. Gallego's illegal detention, but whether they *instigated, encouraged, incited, caused, or participated* in her

illegal detention.   Just like in their original motion to dismiss, the Defendants again fail to acknowledge the difference between: (1) officers who are merely present during an illegal seizure; and (2) officers who *instigate, participate in, or cause* an illegal seizure.   The Eleventh Circuit, however, has long recognized that officers who fall into the latter category are not entitled to immunity.

In *Anderson v. Nosser*, 438 F.2d 183, 198 (5th Cir. 1971), *decision modified on denial of reargument*, 456 F.2d 835 (5th Cir. 1972),[12] the Court upheld the principal that police officers are responsible for the natural consequences of their actions.   The Court stated:

> We instead begin by emphasizing that section 1983 'should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.' … This general rule of liability provides that 'all those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit, are equally liable with him.' So long as there is 'an intent to bring about a result which will invade the interests of another in a way that the law will not sanction' good faith is no defense. In view of these principles was that the conduct involved here must be viewed as a continuum, beginning with the illegal incarceration for failure to bring plaintiffs before a magistrate and ending with the inhuman treatment at Parchman. Each incident flowed proximately and naturally into the other so that each defendant who played 'a substantial role in bringing about the results' is liable jointly and severally for the entire injury and wrong. (citations omitted).

This general principle has also been applied in other cases involving police officers.   See  *Valdes v. Miami-Dade Cty.*, No. 12-22426-CIV, 2013 WL 5429938, at *5 (S.D. Fla. Sept. 27, 2013), *aff'd,* 584 F. App'x 927 (11th Cir. 2014) citing *Anderson v. Nosser,* 438 F.2d at 198; *Nesmith v. Alford,* 318 F.2d 110 (5th Cir.1963).

---

[12] In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit rendered before October 1, 1981.

In *Jordan v. Mosley*, 487 F.3d 1350, 1354 (11th Cir. 2007), the Eleventh Circuit reaffirmed that, "In this Circuit, a non-arresting officer who **instigates** or **causes** an unlawful arrest can still be liable under the Fourth Amendment." (emphasis added) *citing Rodriguez v. Ritchey,* 539 F.2d 394, 400 (5th Cir.1976). "General principles of tort law provide a cause of action for unlawful arrest against a defendant who 'affirmatively **instigated, encouraged, incited, or caused** the unlawful arrest.'" *Rodriguez v. Ritchey*, 539 F.2d 394, 400 (5th Cir. 1976), on reh'g, 556 F.2d 1185 (5th Cir. 1977) (emphasis added)(citations omitted).

For lawsuits brought pursuant to section 1983, a plaintiff only has to prove "an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation." *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986).  Contrary to the Defendants' argument, an officer's culpability regarding an illegal seizure is based on "causation," *i.e.* his level of involvement.  See *Brown v. City of Huntsville*, 608 F.3d 724, 737 (11th Cir. 2010)(a plaintiff may establish "proof of an affirmative causal connection … by proving that the official was personally involved in the acts that resulted in the constitutional deprivation." (quoting *Zatler v. Wainwright,* 802 F.2d 397, 401 (11th Cir. 1986)).  "Questions of causation are usually for a jury under the Seventh Amendment." *Anderson v. Nosser*, 456 F.2d 835, 841 (5th Cir. 1972).

Even more recently, in *Wilkerson v. Seymour*, 736 F.3d 974 (11th Cir. 2013), the Eleventh Circuit discussed a non-arresting officers potential liable under § 1983.  *Wilkerson* emphasizes the degree of participation in an arrest and the amount of information available to the non-arresting officer.  *Id* at 980.  The Court stated that, "What is made explicit in *Jones*[13] is that a

---

[13]*See Jones v. Cannon*, 174 F.3d 1271, 1286 (11th Cir. 1999).  In *Jones*, Powers, a detective, telephoned a state attorney, who advised Powers that there was no probable cause for Jones's arrest for first-degree murder.  *Jones*, 174 F.3d at 1283.  Powers and Bishop arrested Jones for murder anyway, based on Jones's supposed later confession to the murder, which was the sole basis for the warrantless arrest.  *Id*.  After his criminal case was dismissed, Jones filed a 1983 claim against

participant in an arrest, even if not the arresting officer, may be liable if he knew the arrest lacked any constitutional basis and yet participated in some way." *Id*.

A sister court in this district addressed this very same issue last year in *McDonough v. Mata*, No. 19-cv-21986-Moreno, 2020 WL 7350267 (S.D. Fla. Sept. 28, 2020). In *McDonough*, the plaintiff gave police officers the "bird." *Id*. at *11. Officer Wright instructed the plaintiff to stop, turn around, and place his hands behind his back. *Id*. When the plaintiff asked what he was being arrested for, another officer said, "for disorderly conduct," and the other officer placed handcuffs on the plaintiff. *Id*. A third officer then advised the plaintiff that he was under arrest and authored the arrest form. Officer Wright argued that, because he was not the arresting officer, the plaintiff failed to state a claim against him for a Fourth Amendment false arrest. *Id*. Applying the principles laid out by the Eleventh Circuit in *Jones*, *Jordan* and *Wilkerson*,[14] the *McDonough* court found that the allegations were sufficient to establish a jury question as to whether Officer Wright instigated or participated in the plaintiff's arrest. *Id*. at *12-13.

Here, although Perez and Luffi did not physically detain Ms. Gallego like the other officers involved here, Perez and Luffi's undoubtedly *caused*, *instigated* or *participated* in making Ms. Gallego feel as if she was not free to leave. Again, they made fraudulent statement about her, tried

---

Powers and Bishop for false arrest. Jones claimed that his confession to the murder was fabricated and there was no probable cause to arrest him. *Id*. Bishop claimed that he was not sufficiently involved in Powers arrest to be liable for false arrest. Id. at 1284. Bishop relied on the fact that Powers told Jones he was under arrest and Powers prepared the police report. *Id*. However, Bishop stayed with Jones while Powers called the state's attorney about probable cause for an arrest and Bishop was present during the interview when Jones allegedly did not confess. *Id*. Bishop also took notes from which Powers prepared the police report about the arrest. The Eleventh Circuit held that, viewed in the light most favorable to Jones, there was sufficient evidence to create a jury issue over whether Bishop, knowing Jones had not confessed, participated with Powers in Jones's arrest.
[14] *Jones v. Cannon*, 174 F.3d 1271, 1286 (11th Cir. 1999); *Jordan v. Mosley*, 487 F.3d 1350, 1354 (11th Cir. 2007); *Wilkerson v. Seymour*, 736 F.3d 974, 980 (11th Cir. 2013).

to get vendors to implicate her in a crime, told people that she was going to be arrested - including Officers Garcia and Escobar right before this incident.  They barged into a closed election, refused to leave, attempted to confiscate the ballot box, flashed handcuffs at her, and stated "I can't wait to sit in front of you and ask you questions."  Based on the totality of the circumstances, a reasonable jury could find that Perez and Luffi sufficiently instigated, incited, caused or participated in Ms. Gallego's illegal detention.  Accordingly, their claim of "bystander" immunity is meritless.

## IV.  Clearly Established Law.

The Eleventh Circuit has repeatedly held that a seizure without probable cause "clearly" violates the Constitution.  See  *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11 Cir. 1998)("It is clearly established that an arrest made without probable cause violates the Fourth Amendment."); *Childs v. Dekalb Cty., Ga.*, 286 F. App'x 687, 695 (11th Cir. 2008)("It has been clearly established since the Supreme Court  decided *Terry* that an investigative stop – a seizure for Fourth Amendment purposes – performed without reasonable suspicion violates the Fourth Amendment."); *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004) (a warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim) *citing Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. 1990); *Wilkerson v. Seymour*, 736 F.3d 874, 977 (11th Cir. 2013) ("It is clearly established that an arrest made without probable cause violates the Fourth Amendment.").  This principal has been established even in circumstances that fall short of a formal arrest.  *West v. Davis*, 767 F.3d 1063, 1068 (11th Cir. 2014) ("It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for [a] crime.") (internal citations omitted). Here, none of the officers had any reason to detain Mrs. Gallego.

Nevertheless, Perez and Luffi argue that Mrs. Gallego is "asking the Court to bless a novel theory of liability that does not follow immediately from binding precedents in this jurisdiction." [D.E. 53, pg. 20].   According to Perez and Luffi, Mrs. Gallego "cannot produce controlling precedent that liability attaches to an officer who is present during an allegedly unlawful Terry stop but gave no commands restricting a plaintiff's freedom of movement…" [D.E. 53, pg. 19].

Assuming arguendo that Perez and Luffi are correct, just this year, the Eleventh Circuit issued an opinion that eviscerates their "novel theory" argument. In *Hardigree v. Lofton*, 992 F.3d 1216, 1224 (11th Cir. 2021), the Eleventh Circuit stated:

> [G]eneral statements of the law ***are not inherently incapable*** of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, ***even though 'the very action in question has [not] previously been held unlawful.'***(emphasis added, citation omitted)

The Eleventh Circuit reiterated, "to determine if a right is clearly established, we ask whether the state of the law on the date of the alleged misconduct placed defendants on 'fair warning that their alleged treatment of [the plaintiff] was unconstitutional,'" even in novel situations   *Id; quoting Hope v. Pelzer*, 536 U.S. 730, 741 (2002)("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). The cases listed above, and others, provided "fair warning" to Perez and Luffi that their conduct was unconstitutional. *Grayden,* 345 F.3d 1225, 1232. Accordingly, at the time of the incident, Perez and Luffi knew that "what [they were] doing [was] unlawful." See *D.C. Wesby*, 138 S. Ct. 577, 589 (2018) ("Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful.")(internal citations omitted).

Furthermore, qualified immunity is inapplicable because Perez and Luffi did not have probable cause or reasonable to believe that Mrs. Gallego's committed a crime. *Wilkerson v. Seymour*, 736 F.3d 974, 978 (11th Cir. 2013)("Although qualified immunity protects officers who are reasonably mistaken that a crime has been committed, it does not insulate officers from liability for arrests where it is clear that the conduct in question does not rise to the level of a crime…."). Yet, Perez and Luffi instigated, incited, caused, and/or participated in Mrs. Gallego's four-hour detention anyway.   Perez and Luffi knew or should have know that their actions clearly violated the constitution.  Accordingly, they are not entitled to qualified immunity and their motion must be denied. *Mowell v. City of Milton, Georgia*, 810 F. App'x 799, 803 (11th Cir. 2020) ("qualified immunity does not offer protection if an official knew or should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].") (internal citation omitted).

Qualified immunity is also inapplicable because Perez and Luffi's conduct so obviously violates the Constitution that prior case law is unnecessary.  *See Cooper v. Rutherford,* 2012 WL 4856122 (11th Cir. 2012).  Viewing the facts in the light most favorable to Ms. Gallego, and drawing all inferences in her favor, Perez and Luffi attempted to use their badge to strong-arm vendors and contractors to make false statement against Ms. Gallego, which was solely designed to manufacture probable cause to arrest her.  When that did not work, Perez and Luffi forced their way into a closed election and attempted to confiscate election ballots without probable cause or a search warrant.  Ms. Gallego accused Perez and Luffi of committing their fraudulent activity to remove her from the board of directors so that someone close to Luffi could take her position. Mrs. Gallego was forced to sit down.  Perez and Luffi continued to mock Ms. Gallego publicly by flashing handcuffs towards her and stating, "I can't wait to sit in front of you and ask you

questions."   Viewing the facts in the light most favorable to Mrs. Gallego, and drawing all inferences in her favor, Perez and Luffi's conduct obviously violates the Constitution – without any need for case law.

**CONCLUSION**

Based on the foregoing, Plaintiff Ms. Marglli Gallego, respectfully requests this Court to enter an Order denying Defendant Perez and Luffi's *Motion to Dismiss the Second Amended Complaint.*

**Dated:** July 9, 2021.

Respectfully Submitted,

Hilton Napoleon, II, Esq., FBN 17593
RASCO KLOCK PEREZ NIETO
Counsel for the Plaintiff, Marglli Gallego
2555 Ponce de Leon Blvd., Suite 600
Coral Gables, Florida 33134
Telephone: 305.476.7100
Facsimile: 305-476-7102
Email: hnapoleon@rascoklock.com

By: */s/ Hilton Napoleon, II*
         Hilton Napoleon, II

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 9, 2021, I have filed the foregoing document with the Clerk of the Court using the CM/ECF system. I also certify that the foregoing document is being served this day on all counsel and parties of record on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those parties who are not authorized to receive electronically Notices of Electronic Filing.

By:  /s/ *Hilton Napoleon, II*
Hilton Napoleon, II